IN THE DISTRICT COURT of the UNITED STATES

IN AND FOR THE STATE OF NEW JERSEY

Case No.: F-005232-24

*Notice of Removal Action To United States District Court For The District of New Jersey*

DAWN M. ADAMS,

        Plaintiff,

v.

THE FEDERAL RESERVE, ET AL;

CITIGROUP, ET AL;

*Mortg Loan Trust 2021-A*
[RUSHMORE SERVICING], ET AL

        Defendant.

CLERK U.S. DISTRICT COURT DISTRICT OF NEW JERSEY RECEIVED 2025 AUG -6 P 4: 2

# PETITION TO ENFORCE THE ACCEPTANCE OF A BILL OF EXCHANGE AS LEGAL TENDER FOR PAYMENT OF DEBT OBLIGATIONS

### TABLE OF CONTENTS:

I.    **TABLE OF AUTHORITIES**

II.   **NOTICE OF REMOVAL**

III.  **FEDERAL QUESTIONS**

IV.  **INTRODUCTION**

V.   **JURISDICTION**

VI.  **JURISDICTIONAL CHALLENGE TO UNLAWFUL STATUTORY SCHEME**

**VII.**    **HISTORICAL BACKGROUND**

**VIII.**   **DEFINITIONS**

**IX.**     **STATEMENT OF FACTS**

**X.**      **LEGAL FRAMEWORK AND ANALYSIS**

**XI.**     **SUMMARIZATION**

**XII.**    **FRACTIONAL RESERVE BANKING, RIGHT OF OFFSET, AND THE DEMAND FOR ACCOUNTING**

**XIII.**   **CERTIFICATION, VERIFICATION, AND VALIDATION**

---

## I.    TABLE OF AUTHORITIES

Statutes

Federal Reserve Act, Title IV, § 401, ¶ 6, Subsection 18.

Federal Reserve Act, § 403(o).

Joint Resolution 10, Public Law 73-10.

Uniform Commercial Code (UCC) §§ 3-104, 9-203, 9-207, and 9-513.

12 U.S.C. § 347.

Securities Act of 1933, §§ 2 and 17.

59 Stat. 237 § 2.

Case Law

First National Bank of Boston v. Fairhaven Amusement Co., 347 Mass. 243 (1964).

In re Bristol Associates, Inc., 505 F.2d 1056 (3d Cir. 1974).

Matter of Copeland, 531 F.2d 1195 (3d Cir. 1976).

Buffalo Evening News, Inc. v. Small Business Admin., 666 F.Supp. 467 (W.D.N.Y. 1987).

Halpern v. FBI, 181 F.3d 279 (4th Cir. 1999).

U.S. v. Knox, 396 U.S. 77 (1969).

Securities & Exch. Comm'n v. W.J. Howey Co., 328 U.S. 293 (1946).

Judicial Watch, Inc. v. FDA, 449 F.3d 141 (D.C. Cir. 2006).

OSHA Data/CIH, Inc. v. U.S. Dep't of Labor, 220 F.3d 153 (3d Cir. 2000).

South Carolina v. Katzenbach, 383 U.S. 301 (1966).

Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164 (1994).

Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).

Perry v. United States, 294 U.S. 330 (1935).

Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938).

Standard Oil Co. of New Jersey v. United States, 221 U.S. 1 (1911).

Baker v. Carr, 369 U.S. 186 (1962).

Marbury v. Madison, 5 U.S. (1 Cranch) 137 (1803).

McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316 (1819).

Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1 (1824).

Whitman v. American Trucking Associations, 531 U.S. 457 (2001).

Auer v. Robbins, 519 U.S. 452 (1997).

Skidmore v. Swift & Co., 323 U.S. 134 (1944).

City of Arlington v. FCC, 569 U.S. 290 (2013).

Citizens United v. FEC, 558 U.S. 310 (2010).

Nebbia v. New York, 291 U.S. 502 (1934).

Martin v. Hunter's Lessee, 14 U.S. (1 Wheat.) 304 (1816).

Ex parte Quirin, 317 U.S. 1 (1942).

Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952).

Goldwater v. Carter, 444 U.S. 996 (1979).

Coleman v. Miller, 307 U.S. 433 (1939).

National Federation of Independent Business v. Sebelius, 567 U.S. 519 (2012).

Arizona v. United States, 567 U.S. 387 (2012).

Federal Energy Regulatory Commission v. Mississippi, 456 U.S. 742 (1982).

Missouri v. Holland, 252 U.S. 416 (1920).

New York v. United States, 505 U.S. 144 (1992).

## II.    NOTICE OF REMOVAL

TO THE HONORABLE DISTRICT COURT OF THE UNITED STATES OF AMERICA:

The Plaintiff, **DAWN M ADAMS**, hereby submits this **Notice of Removal**, pursuant to 28 U.S.C. §§ 1331, 1332, and 1441, removing this matter to the **District Court of the United States of America** based on the following grounds:

1. **Amount in Controversy**
   This matter involves a **controversy exceeding $75,000**, as evidenced by the Plaintiff's claims for compensatory damages of **$3,000,000** and punitive damages of **$5,000,000**, arising from the Defendant's violations of federal law, constitutional protections, and fiduciary duties. The Plaintiff has substantiated that the Defendant's refusal to honor the **bill of exchange** and **promissory note**, as well as its unlawful foreclosure actions, have caused significant harm to the Plaintiff, far exceeding the minimum statutory threshold for diversity jurisdiction.

2. **Diversity of Citizenship**
   There exists **diversity of citizenship** between the Plaintiff and the Defendant. The Defendant, as a **depository institution and member of the Federal Reserve System**, operates under the Federal Reserve, which is situated outside the State of domicile of the Plaintiff. The Federal Reserve Banks function as instrumentalities of the United States, separate from any specific State, ensuring diversity of citizenship under federal jurisdiction. This distinction satisfies the diversity requirement under **28 U.S.C. § 1332(a)**, granting this Court jurisdiction to adjudicate the controversy.

3. **Federal Questions**
   This case presents **substantial federal questions** arising under the laws of the United States, including but not limited to the **Federal Reserve Act, 59 Stat. 237 § 2**, **Joint Resolution 10**, the **Uniform Commercial Code**, and applicable **Treasury regulations**. The claims involve the application, interpretation, and enforcement of federal statutes governing **legal tender**, **fractional reserve banking**, and the **Borrower-in-Custody (BIC) Program**, as well as constitutional questions under the **First, Seventh**, and **Fourteenth Amendments**. The presence of these federal issues provides this Court with original jurisdiction under **28 U.S.C. § 1331**, making removal proper.

4. **Non-Core Venue and Jurisdiction**
   The Plaintiff stipulates that this matter is being brought as a **non-core venue matter** within the jurisdiction of the **District Court of the United States of America**. This Petition is presented solely to exercise constitutionally secured rights, including the right to access the Court, petition for redress of grievances, and demand a trial by jury, as guaranteed under the Constitution. This action is not to be construed as relying on any administrative statutes, codes, or ordinances but instead invokes the judicial branch's constitutional authority to hear matters involving federal law, constitutional protections, and controversies exceeding $20.

---

## III.    VERIFIED BILL OF RIGHTS CONSTITUTIONAL Questions

The following **Bill of Rights supported constitutional questions** arise directly from the claims and violations directly associated with the constitutional issues presented in this matter:

1. Does the refusal to honor a **bill of exchange** and **promissory note** presented for the payment of an alleged in compliance with the act "to uniform the value of the coins and currencies of the United States" and the Federal Reserve act which identifies bills and exchanges and promissory notes as eligible papers as well as legal tender violate the **Federal Reserve Act, Title IV, § 401**, which mandates their acceptance at par value in all parts of the United States (see subsection 18 (6))?

2. Does the Defendant's participation in the **Borrower-in-Custody (BIC) Program and other similar programs offered by the Federal Reserve**, while refusing to account for pledged collateral, violate the Plaintiff's Co8nstitutionally Secured Rights under **12 U.S.C. § 412** and **59 Stat. 237 § 2**?

3. If the defendant is holding onto the pledge collateral as security and/or securitizing the pledge collateral after deposit and receiving funds directly associated from the pledge collateral, this does not constitute as income, from whatever source derived?

4. Does the Defendant's failure to offset the value of pledged collateral against the claimed debt violate the **common-law right of offset** as recognized in national common-law law? The common-law right of offset is cognizant by the GOVERNMENT OF THE UNITED STATES is it not?

5. Does the Defendant's refusal to provide a comprehensive accounting of funds received from fractional reserve banking processes violate the Plaintiff's Constitutionally Secured Rights under **9 U.S.C. § 210**? The borrower in custody program? And their right to contract under the Constitution?

6. Does the Defendant's participation in Federal Reserve programs, such as the **Discount Window**, **Term Auction Facility (TAF), Primary Dealer Credit Facility (PDCF)**, and **Term Securities Lending Facility (TSLF)**, preclude its claim of financial harm due to enrichment through pledged collateral? By depositing the pledge collateral and depositing the funds received from the Federal Reserve each in excess of 900% of the original value of the promissory note, create a source of income from "whatever source derived", placing several legal requirements upon the defendant respecting an accounting?

7. The BIC program otherwise known as the borrower in custody program which is directly related or associated with this matter, requires that there be an annual accounting, and since the borrower is identified as a beneficiary and a holder in due course, the pledgor of the collateral and the creator of the collateral, are they not entitled to the audit evidenced by **THE BORROWER-IN-CUSTODY** program?

8. Does the failure to honor the Plaintiff's tendered instruments constitute a violation of the Plaintiff's Constitutionally Secured Rights to due process under the **Fifth and Fourteenth Amendments**? As there is an alleged oblige/obligor relationship, and therefore, joint resolution 10 appears to be wholly applicable, as Congress has regulated the application in such situations, have they not?

9. Does the congressional statutory scheme refusal to provide a trial by jury in foreclosure matters exceeding $20 violate the Plaintiff's **Seventh Amendment** constitutionally secured rights especially when we take into consideration, the prohibition against the abridgment of rights secured by the Bill of Rights? And does the statutory scheme in any sense and/or on any level constitute an abridgment of the plaintiff's rights in such situations, to counterclaim and/or counters with the right to access the Court and to access the trial by jury?

10. Does the use of nonjudicial foreclosure mechanisms in cases involving Federal Reserve-backed programs violate the Plaintiff's **First Amendment** constitutionally secured right to petition for redress of grievances?

11. Does the Defendant's enrichment through fractional reserve banking processes constitute **unjust enrichment** under federal law and common law principles? Especially when the fractional reserve amount is directly associated with the deposit by the US BORROWER as defined by Federal Reserve operating circular 10? And if this is indeed considered a source of income for the financial depository institution, is there failure to document this income and to notify the borrower through offset of this income, does it not constitute unjust enrichment?

12. Does the Defendant's refusal to comply with **Treasury regulations, IRM 21.1.7.9.22, which evidences the federal government receiving bills and exchanges as a former remittance in payment for past dues and/or taxes constituting a form of legal tender as defined in the act of June 5, 1933 referencing "coins and currencies of the United States"**, regarding the acceptance of **bills of exchange** as payment and remittances in violation of the law?

13. Does the classification of the Plaintiff's promissory note and bill of exchange as **securities under the Securities Act of 1933, §§ 2 and 17**, impose fiduciary obligations on the Defendant that it has failed to meet, by not following the guidelines which are mandated and outlined in law?

14. Does the Defendant's failure to adhere to **Uniform Commercial Code (UCC) §§ 3-104, 9-203, and 9-207**, which has been adopted by every State and territory of the union evidencing the enforceability of negotiable instruments and fiduciary duties, violate national and State standards?

15. Does the Defendant's participation in Federal Reserve programs preclude it from claiming any **substantial loss**, as its claims of harm are inconsistent with the financial benefits received under these programs? As the program permits and allows the defendants to fractional reserve each deposit, and there are two deposits at least directly associated with the instant matter, and that fractional reserve allowed the depository institution to lend out more monies and thus taken more interest and more interest payments?

16. Does the refusal to honor pledged collateral as valid tender under the **BIC Program** constitute a breach of the Defendant's obligations under **Federal Reserve Operating Circular No. 10**? The defendant under section 7 is required to comply with the provisions of the act and the operating circular associated with the BIC program. Failure of the defendant to account for the pledge collateral and its valuation and then to apply any credits and/or offsets to the US BORROWER account violates the right to contract clause?

17. The section 12.3 of the Federal Reserve operating circular 10 violate the due process rights of the petitioners by incorporating an unconscionable clause? Does section 13.1 under indemnity also violate the unconscionable clause in that both clauses taking either independently or conjointly,

suggests that the depository institution can commit every unconscionable wrong, and not be held liable for its actions even to the injury of the US BORROWER? That is not only unreasonable but it seems to be a breach of the agreement between the parties as to the mutual consent, mutual benefit and value requirements of a valid contract?

18. **Fifth Amendment Due Process & Takings Clause**
Does the refusal to accept a bill of exchange as legal tender under federal statutes violate the Plaintiff's Fifth Amendment rights by depriving them of property without due process or just compensation?

19. **Fifth Amendment Due Process**
Does the Defendant's failure to account for pledged collateral under the BIC Program violate the Plaintiff's Fifth Amendment right to due process by unlawfully retaining property?

20. **Fifth Amendment Due Process**
Does classifying pledged collateral as taxable income without justification constitute an arbitrary deprivation of property under the Fifth Amendment?

21. **Seventh Amendment & Fifth Amendment Due Process**
Does the denial of the common-law right of offset violate the Plaintiff's Seventh Amendment right to common-law remedies or Fifth Amendment due process?

22. **Fifth Amendment Due Process (Right to Contract)**
Does withholding accounting for fractional reserve transactions infringe on the Plaintiff's Fifth Amendment right to due process by impairing contractual freedoms?

23. **Fifth Amendment Takings Clause**
Does the Defendant's enrichment via Federal Reserve programs, while alleging financial harm, constitute an unconstitutional taking under the Fifth Amendment?

24. **Fifth Amendment Due Process**
Does the Defendant's failure to provide annual audits under the BIC Program violate the Plaintiff's Fifth Amendment right to transparency and due process?

25. **Fifth and Fourteenth Amendments (Due Process)**
Does refusing to honor tendered instruments as payment violate due process by denying the Plaintiff fair legal procedures under the Fifth and Fourteenth Amendments?

26. **Seventh Amendment (Jury Trial)**
Does denying a jury trial in foreclosure cases exceeding $20 violate the Plaintiff's Seventh Amendment right to a civil jury trial?

27. **First Amendment (Right to Petition)**
Does nonjudicial foreclosure under Federal Reserve programs unlawfully restrict the Plaintiff's First Amendment right to petition for redress?

28. **Fifth Amendment (Unjust Enrichment)**
Does unjust enrichment through fractional reserve banking deprive the Plaintiff of property

without due process under the Fifth Amendment?

29. **Fifth Amendment (Legal Tender)**
Does rejecting bills of exchange as payment violate the Plaintiff's Fifth Amendment rights by disregarding congressionally mandated legal tender?

30. **Fifth Amendment (Fiduciary Duty)**
Does the Defendant's failure to fulfill fiduciary obligations under securities law constitute a due process violation under the Fifth Amendment?

31. **Fifth Amendment (Due Process)**
Does noncompliance with UCC provisions violate due process by disregarding enforceable legal standards under the Fifth Amendment?

32. **Fifth Amendment (Takings Clause)**
Does retaining Federal Reserve program benefits while claiming losses amount to an unconstitutional taking under the Fifth Amendment?

33. **Fifth Amendment (Contractual Due Process)**
Does refusing to honor collateral under the BIC Program breach the Plaintiff's Fifth Amendment right to due process in contractual agreements?

34. **Fifth Amendment (Unconscionability)**
Do unconscionable clauses in Federal Reserve agreements violate the Plaintiff's Fifth Amendment right to fair and equitable legal processes?

Does the statutory framework allowing nonjudicial foreclosures, without providing judicial oversight in matters involving pledged collateral, violate the **due process rights** of borrowers under the **Fifth Amendments**?

## Justification for removal

Based on the aforementioned grounds and federal questions, the Plaintiff respectfully removes this matter to the non-core venue known as the **District Court of the United States of America**. The Plaintiff requests that this Court assume jurisdiction over the case, grant all relief sought, and ensure that constitutional rights are fully upheld.

---

## IV.    INTRODUCTION

The Plaintiff, **[Your Name]**, files this Petition to enforce the recognition and acceptance of a **bill of exchange** as a lawful instrument of payment for the discharge of a debt obligation under federal law. Congress has clearly and unequivocally declared that **bills of exchange**, along with other negotiable instruments such as promissory notes, trade acceptances, bankers' acceptances, and drafts, are to be recognized as **legal tender** for the payment of public and private debts. Defendant's refusal to accept the **bill of exchange** violates statutory law, federal regulations, and established judicial precedent.

The **Federal Reserve Act, Title IV, § 401**, explicitly states that bills of exchange and related instruments are receivable **at par value**, meaning they hold equal standing with **Federal Reserve notes**, **national banknotes**, and other recognized forms of legal tender. Congress reaffirmed this in **Joint Resolution 10**,

passed on **June 5, 1933**, which mandates that all such instruments be treated as legal tender. Further support is found in **59 Stat. 237 § 2**, which establishes that these instruments cannot be received for less than their face value, ensuring their full functionality as valid tender in the payment of debts. The instruments are explicitly designated as **receivable** and **redeemable,** which inherently confirms their legal tender status.

Despite these clear legislative mandates, the Defendant initially suggested that a **bill of exchange** does not constitute legal tender. This assertion is not only legally unfounded but also contradictory to the statutory framework under the Federal Reserve Act and Joint Resolution 10. If an instrument is **receivable** and **redeemable,** as Congress has stated, it necessarily functions as legal tender under the law. Moreover, the **Internal Revenue Service (IRS)** accepts **bills of exchange** as **payments** or **remittances,** further affirming their status as tender for satisfying debt obligations. Treasury guidelines, including **IRM 21.1.7.9.22,** establish that **bills of exchange** are processed as valid instruments for tax settlements, reinforcing their classification as legal tender.

The Plaintiff also tendered a **promissory note,** which was accepted as pledged collateral under the **Borrower-in-Custody (BIC) Program,** regulated by the Federal Reserve. This note, classified as a **security** under the **Securities Act of 1933, §§ 2 and 17,** further validates the **bill of exchange** as legal tender. Under the BIC Program, pledged collateral must have demonstrable value, and the acceptance of the promissory note underscores its status as a valid instrument. The Defendant's refusal to honor both the **bill of exchange** and **promissory note** constitutes a breach of federal law, as well as a disregard for Congressional mandates ensuring the enforceability of such instruments.

The Plaintiff therefore seeks judicial enforcement compelling the Defendant to comply with federal law by accepting the **bill of exchange** and **promissory note** as full satisfaction of the debt obligation. The Plaintiff further demands declaratory relief affirming the legal tender status of these instruments, injunctive relief to prevent further non-compliance by the Defendant, and any other remedies deemed appropriate, including compensatory and punitive damages. These remedies are necessary to enforce compliance with federal statutes and regulations and to protect the Plaintiff's Constitutionally Secured Rights under the law.

## V.    JURISDICTION

The District Court of the United States and or The County Court has original jurisdiction, the former pursuant to **28 U.S.C. § 1331** and the latter Pursuant to the Constitution for This Great State, as the claims presented in this Petition arise under both national and local constitutional law, including the **Federal Reserve Act, Title IV, § 401,** which explicitly designates **bills of exchange** as legal tender for the payment of debts, by stating it's at par with national banknotes and circulating notes of the Federal Reserve, being both redeemable and receivable in "all" parts of the United States'. The claims also arise under **59 Stat. 237 § 2,** which mandates that all pledged collateral, including **bills of exchange,** be accepted at **par value,** ensuring that these instruments are treated as legal tender, stating that it "*in no event shall the collateral security be less than the total amount of Federal Reserve notes applied for*". Additionally, the claims are governed by **12 U.S.C. § 347,** which authorizes Federal Reserve Banks to issue advances against acceptable collateral, including **bills of exchange** and **promissory notes,** further affirming their value as legal tender, as the Federal Reserve in this instant matter issued Federal Reserve

notes directly related to the depositing of the promissory note as pledged collateral. The **Securities Act of 1933, §§ 2 and 17**, classifies these instruments as securities, providing an additional legal framework for their enforceability.

Upon deposit of the promissory note, the bank participated in secularization and for collateralizing the note and fractional reserving the deposit in excess of its original face value and the Federal Reserve's issuance of Federal Reserve notes of that excess value allowed for the subsequent fractional reserve of the funds that were deposited into the account of **THE BORROWER IN CUSTODY**.

This Court has jurisdiction to enforce legal obligations arising under **Joint Resolution 10 (Public Law 73-10)**, which establishes that all **negotiable instruments**, including **bills of exchange, promissory notes, bankers' acceptances, trade acceptances, and drafts**, are legal tender for public and private debts. Joint Resolution 10 serves as a definitive Congressional declaration that all forms of currency and negotiable instruments regulated by federal law are to be treated equally in value and applicability. The Defendant's refusal to accept the Plaintiff's properly tendered **bill of exchange** and **promissory note** constitutes a violation of this federal mandate and falls squarely within the jurisdiction of this Court for resolution.

The Defendant is subject to the jurisdiction of this Court as they conduct business within this judicial district and are bound by federal statutes governing banking operations and legal tender, including those outlined in the **Federal Reserve Act** and **Uniform Commercial Code (UCC)**. These laws apply to all financial institutions operating under federal charters, licenses, or regulations, ensuring compliance with legal obligations related to negotiable instruments. Venue is proper under **28 U.S.C. § 1391**, as the events giving rise to this Petition, including the Defendant's refusal to accept the tendered instruments, occurred within the geographical boundaries of this judicial district.

The Defendant's participation in the **Borrower-in-Custody (BIC) Program**, authorized under the Federal Reserve Act and regulated by **Federal Reserve Operating Circular No. 10**, subjects its actions to federal oversight and compliance. Under the BIC Program, institutions are required to certify and pledge acceptable collateral, including **bills of exchange** and **promissory notes**, to the Federal Reserve. The Plaintiff's **promissory note** was duly accepted as pledged collateral, satisfying all requirements of the BIC Program, including documentation of value. Defendant's refusal to comply with federal regulations governing pledged collateral places its actions within the scope of federal law and subjects it to judicial review.

Supplemental jurisdiction exists under **28 U.S.C. § 1367**, as any State law claims arising from the Defendant's refusal to accept the Plaintiff's tendered instruments are directly related to the federal law violations outlined in this Petition. These State claims are inextricably linked to the same facts and

circumstances, involving the Defendant's failure to honor federal obligations and adhere to the legal tender status of **bills of exchange** and **promissory notes**. The Plaintiff seeks resolution of all claims within this Court to ensure comprehensive enforcement of federal and State laws.

The defendants, in conjunction with the Federal Reserve have apparently conspired together to unjustly enrich themselves. As it appears that the depository institution not only deposited the promissory note, but, requested additional funds from the Federal Reserve without notifying the borrower of the specific amount that it was requesting, and then appears to have deposited the funds into the borrower's account, but an account not revealed to the borrower but opened by the bank on the borrower's behalf without notifying the borrower. Then the depository institution fractional reserve it appears, the promissory note or bill of exchange or other eligible paper deposited by the borrower, subsequently transferring and/or transforming the instrument into a security by collateralizing, and then fractional reserving the funds received by the Federal Reserve. The fractional reserve amount, is constituted income because it's derived from 'a source', which means that any amount over and above the amount originally pledged by the borrower under the borrower's intent, would justify unjust enrichment especially when the depository institution fails to notify the "US BORROWER", for whom the collateral has been pledged and then holds the collateral while at the same time claiming that there is an outstanding debt, when there is no actual outstanding debt as evidenced by the aforementioned transactions. This conspiracy and the unjust enrichment and the failure to inform and for reliance upon this information resulting therefrom to the injury of the borrower and/or the borrower's property or the elements of fraud and conspiracy to defraud which are also the same elements of R.I.C.O. which is alleged herein and evidenced by the facts and conclusions of law retched herein!

---

## VI.    JURISDICTIONAL CHALLENGE TO UNLAWFUL STATUTORY SCHEME

1. **Constitutional Right to Due Process in Foreclosures**

   The statutory scheme enabling **nonjudicial foreclosures** violates the **Seventh Amendment**, which guarantees the right to a **trial by jury** in controversies exceeding $20. Congress has no constitutional authority to abridge this fundamental right under the guise of efficiency for creditors, as the Constitution provides no exceptions for monetary disputes above this threshold. The statutory framework allowing nonjudicial foreclosures inherently denies borrowers their right to due process by circumventing judicial oversight, even in cases where borrowers are part of the **Borrower-in-Custody (BIC) Program** or other Federal Reserve-backed programs. The right to petition the government for grievances, as preserved under the **First Amendment**, further prohibits the foreclosure process from proceeding without adequate judicial review.

2. **Congress's Misplaced Justification for Speedy Foreclosures**

   Congress's justification for expedited nonjudicial foreclosure processes rests on claims of harm to creditors, which are factually inaccurate when viewed in the context of Federal Reserve-backed programs. Financial institutions participating in these programs, such as the **Discount Window**,

**Term Auction Facility (TAF)**, **Primary Dealer Credit Facility (PDCF)**, and **Term Securities Lending Facility (TSLF)**, benefit from substantial liquidity provisions. These programs ensure that depository institutions receive immediate and significant funding against pledged collateral, often far exceeding the value of the borrower's original promissory note. As a result, claims of creditor harm or loss are disingenuous, given the additional compensation obtained through these mechanisms.

3. **Fractional Reserve Banking and Depository Enrichment**

Through **fractional reserve banking**, financial institutions are authorized to lend or invest a multiple of their deposits, typically up to **900% of the original deposit amount**. When borrowers tender **promissory notes** or similar negotiable instruments, financial institutions convert these instruments into **pledged collateral** and securitize them. This process allows the institution to participate in Federal Reserve programs, which provide additional funding or liquidity. The funds received from the Federal Reserve are then redeposited and subjected to a second round of fractional reserve lending, effectively creating an exponential increase in the institution's capital base. This enrichment demonstrates that claims of loss by financial institutions are not only unfounded but suggest fraudulent intent when used to justify foreclosure.

4. **Discount Window Lending and Fractional Reserve Multiplication**

The **Discount Window** is a long-standing Federal Reserve program that provides **short-term loans** to depository institutions. These loans are secured against pledged collateral, including instruments such as **promissory notes**, **bills of exchange**, and other securities. Once pledged, the Federal Reserve issues funds to the financial institution, which can then use those funds as the basis for additional fractional reserve lending. By leveraging the liquidity provided through the Discount Window, institutions can lend or invest up to nine times the original amount, generating significant profit from the borrower's collateral without demonstrating any measurable loss.

5. **Term Auction Facility (TAF) and Long-Term Liquidity**

The **Term Auction Facility (TAF)** expands upon the Discount Window by allowing institutions to obtain **longer-term funding** through an auction process. Depository institutions pledge collateral, such as **bills of exchange** or **promissory notes**, and receive funding directly from the Federal Reserve. The auction mechanism ensures that institutions receive competitive interest rates while maintaining access to liquidity. This process results in the institution gaining multiple streams of profit: the proceeds of the auction, the collateral's retained value, and additional fractional reserve lending opportunities. These substantial financial benefits further invalidate claims of loss or harm, particularly when foreclosure is pursued.

6. **Primary Dealer Credit Facility (PDCF) and Market Stabilization**

The **Primary Dealer Credit Facility (PDCF)** provides liquidity specifically to **primary dealers**, enabling them to obtain funds against pledged securities. This program extends **Discount Window-style lending** to a broader range of financial institutions, allowing them to secure funding against Treasury securities and other eligible collateral. By participating in the PDCF, financial institutions can manage short-term liquidity needs without resorting to foreclosure as a means of recouping alleged losses. The availability of such programs undermines the statutory justification for nonjudicial foreclosures, as creditors are not reliant on borrower payments to

maintain financial stability.

7. **Term Securities Lending Facility (TSLF) and Collateral Liquidity**

The **Term Securities Lending Facility (TSLF)** allows primary dealers to exchange lower-rated securities for **Treasury securities**, providing additional liquidity to financial institutions. This program emphasizes the importance of pledged collateral, which retains its value as a securitized instrument even after being pledged for funding. Financial institutions participating in the TSLF benefit from increased market liquidity and are further enriched by the ability to redeposit received funds into fractional reserve banking systems. This enrichment eliminates any reasonable claim of loss and highlights the inequity of foreclosure proceedings based on already-compensated instruments.

8. **Enrichment Through Multiple Collateralization Cycles**

Financial institutions participating in Federal Reserve programs effectively **double-dip** by leveraging pledged collateral for both funding and fractional reserve banking. The original **promissory note**, once securitized, becomes the basis for Federal Reserve funding, while the funds received are deposited into borrower accounts under the institution's control. These deposits are then fractionally reserved, multiplying the institution's lending capacity by up to nine times the original amount. This process demonstrates that institutions suffer no measurable loss and, in fact, are unjustly enriched by the borrower's pledged collateral. Claims of loss, particularly those used to justify foreclosure, are therefore fraudulent and impermissible under the law.

9. **Violation of Maxims of Law and Borrower Rights**

The financial institution's ability to profit from pledged collateral while pursuing foreclosure violates established **maxims of law**, including principles of **equity and fairness**. The borrower's participation in programs such as the BIC Program ensures that the pledged collateral retains measurable value, as evidenced by the institution's ability to securitize and profit from the instrument. Any amount exceeding the face value of the original **promissory note** is the responsibility of the financial institution and not the borrower. The institution's refusal to account for this enrichment and its subsequent pursuit of foreclosure constitute a violation of due process and a deprivation of the borrower's rights under the **Seventh Amendment**.

---

## VII.    HISTORICAL BACKGROUND

·  Congress has long recognized the importance of negotiable instruments as an integral part of the U.S. monetary system, establishing their status as **legal tender** under the **Federal Reserve Act, Title IV, § 401**, and further reinforcing this status through subsequent legislation such as **59 Stat. 237 § 2** and **Joint Resolution 10, Public Law 73-10**. The inclusion of **bills of exchange, promissory notes, bankers' acceptances**, and **trade acceptances** within the definition of legal tender reflects Congress's clear intent to expand the concept of currency beyond physical coin and paper money. By mandating that these instruments be treated **at par value**, Congress ensured that they would function as an equivalent to **national banknotes** and **Federal Reserve notes**, thereby creating a **new form of currency**, often referred to as **eligible paper** or **commercial paper**.

· The intent of Congress to elevate **negotiable instruments** to the status of legal tender is evident in its use of the word "including" within legislative definitions of "coins and currencies of the United States." This legal term, when applied in statutory construction, is broad and non-exhaustive, indicating that the enumerated examples—such as **bills of exchange** and **promissory notes**—are illustrative rather than exclusive. This broad interpretation was solidified by the **June 5, 1933 Act (Joint Resolution 10),** which explicitly declared that all forms of U.S. currency and negotiable instruments were to be treated equally for the payment of debts. The legislative language ensured that these instruments were **receivable and redeemable** in all parts of the United States, providing them with the full functionality of legal tender.

· Congress's intent to create a uniform system of currency that includes negotiable instruments is further demonstrated in **12 U.S.C. § 347**, which authorizes Federal Reserve Banks to issue advances against **acceptable collateral**, including **bills of exchange** and **promissory notes**. This provision not only affirmed the validity of these instruments but also established their value as a basis for Federal Reserve operations. The law further ensured that Federal Reserve notes could only be issued upon the deposit of adequate collateral, such as the **promissory notes** pledged by borrowers under the Borrower-in-Custody (BIC) Program. The requirement that collateral be accepted **at par value** underscores Congress's intent to treat these instruments as equal to currency, thereby strengthening the foundation of the U.S. monetary system.

· The **Securities Act of 1933**, particularly §§ 2 and 17, further bolstered the status of **negotiable instruments** as legitimate and enforceable securities. By classifying **bills of exchange** and **promissory notes** as securities, Congress provided a comprehensive legal framework that ensured their recognition and enforceability in both financial markets and commercial transactions. This legislative framework supported the overarching goal of Congress to create a monetary system where negotiable instruments could serve not only as a means of securing Federal Reserve advances but also as a reliable medium for the payment of debts. Courts have repeatedly upheld this principle, as seen in **Securities & Exchange Comm'n v. W.J. Howey Co., 328 U.S. 293 (1946)** and **Buffalo Evening News, Inc. v. Small Business Admin., 666 F.Supp. 467 (W.D.N.Y. 1987)**, where the enforceability of negotiable instruments as securities was affirmed.

· The passage of **Joint Resolution 10** in 1933 further emphasized Congress's intent to eliminate distinctions between different forms of currency and negotiable instruments. By including **bills of exchange, bankers' acceptances, promissory notes, and other instruments** within the definition of "coin and currency of the United States," Congress made clear its intent to provide a unified legal tender system. This resolution was a direct response to economic instability and sought to enhance the liquidity of financial markets by ensuring that all instruments recognized under the Federal Reserve Act were universally receivable. The use of the term "including" in the resolution allowed for a broad and flexible application of the law, ensuring that any instrument meeting federal standards could function as legal tender.

· The **Borrower-in-Custody (BIC) Program**, as governed by **Federal Reserve Operating Circular No. 10**, is a practical implementation of Congress's intent to utilize negotiable instruments as a cornerstone of the U.S. financial system. The program allows borrowers to deposit **promissory notes** as pledged collateral, which the depository institution then securitizes and collateralizes. The Federal Reserve, in turn, issues Federal Reserve notes based on the excess value of the deposited collateral, demonstrating the functionality of negotiable instruments as a basis for currency creation. Courts have acknowledged this mechanism in cases such as **Matter of Copeland, 531 F.2d 1195 (3d Cir. 1976)** and **In re Bristol Associates, Inc., 505 F.2d 1056 (3d Cir. 1974)**, which affirm the legal and financial implications of pledged collateral under the BIC Program.

· Congress's intent to regulate and expand the use of negotiable instruments as currency is rooted in its constitutional authority under **Article I, Section 8**, which grants Congress the power to regulate the value of money and ensure uniformity across the United States. This authority is reflected in **59 Stat. 237 § 2**, which prohibits the acceptance of pledged collateral at less than its face value and mandates that all Federal Reserve notes issued against such collateral be redeemable in lawful money. The legislative framework ensures that the value of negotiable instruments is protected and enforceable, preventing their undervaluation in financial transactions.

· Treasury regulations, including **IRM 21.1.7.9.22 (04-19-2012)**, reinforce Congress's intent by establishing detailed procedures for the acceptance of **bills of exchange** and similar instruments as valid remittances for the payment of taxes and debts. These regulations align with the Federal Reserve Act and Joint Resolution 10, mandating that such instruments be treated as legal tender and processed accordingly. The rejection of these instruments constitutes a violation of federal law, as recognized in cases such as **Judicial Watch, Inc. v. FDA, 449 F.3d 141 (D.C. Cir. 2006)** and **Halpern v. FBI, 181 F.3d 279 (4th Cir. 1999)**, which affirm the enforceability of federal statutes governing negotiable instruments.

· Taken together, the legislative history, statutory provisions, and judicial precedents demonstrate Congress's clear intent to establish **bills of exchange**, **promissory notes**, and similar instruments as an integral part of the U.S. monetary system. These instruments are not only recognized as legal tender but are also indispensable to the operation of the Federal Reserve and the financial stability of the United States. The Plaintiff's tender of a **bill of exchange** and **promissory note** complies fully with these legal standards, and the Defendant's refusal to accept them is unjustified under federal law.

- Congress, in enacting the **I Am an American, Citizenship and Constitution Commemoration Date Act**, formally recognized the age of **21** as the age of majority at which individuals attain the status of **self-governing sovereign American citizens**. This recognition aligns with the foundational principles of the Constitution, as reflected in the **First**, **Fourth**, **Fifth**, **Ninth**, and **Tenth Amendments**, which collectively affirm the individual's rights to self-determination, property, and due process. At the age of majority, individuals are vested with the ability to engage in commercial transactions and exercise full sovereignty over their financial and legal affairs, including the issuance and endorsement of negotiable instruments.

- Congress's actions following the **seizure of gold reserves** during the Great Depression further reinforced the rights of individuals to use **commercial paper** and **eligible paper** as a substitute for traditional currency. This legislative shift was explicitly designed to ensure that individuals retained their ability to meet financial obligations and discharge debts without reliance on physical currency. The inclusion of **bills of exchange, promissory notes, and other negotiable instruments** in the definition of legal tender served as a remedy for the absence of gold-backed currency and affirmed Congress's intent to preserve the individual's capacity to operate within the economy on an equal footing.

- By empowering individuals to use negotiable instruments such as **bills of exchange**, Congress provided a mechanism for citizens to retain economic sovereignty. The refusal by alleged creditors, custodians, or proxies to honor these instruments violates fundamental principles of **due process** and individual rights. This violation undermines the framework established by Congress to ensure that negotiable instruments, when properly executed and tendered, serve as lawful substitutes for traditional currency. **Joint Resolution 10, 59 Stat. 237 § 2, and related statutes**

explicitly protect these rights, ensuring that individuals retain the ability to fulfill financial obligations using instruments that are both **receivable** and **redeemable** under the law.

- The enactment of the **Federal Reserve Act** and subsequent legislation, including the **Securities Act of 1933**, established that negotiable instruments are not merely financial tools but also legal instruments representing the holder's full faith and credit. The inclusion of terms like "including" within the statutory definitions of **coins and currencies of the United States** demonstrates Congress's intent to interpret these terms broadly, encompassing a wide range of instruments such as **bills of exchange, trade acceptances, bankers' acceptances, and promissory notes**. This broad statutory construction ensures that individuals have access to lawful substitutes for traditional currency, reinforcing the principles of **self-governance** and financial autonomy.

- The rights conferred to individuals upon attaining the age of majority include the ability to operate within the **Borrower-in-Custody Program** as the original issuer of negotiable instruments such as **promissory notes**. These instruments, once deposited with a depository institution, are securitized and used to facilitate advances by the Federal Reserve. This process, authorized under **12 U.S.C. § 347** and regulated by **Federal Reserve Operating Circular No. 10**, underscores the individual's role as the originator and rightful holder in due course of the transaction. The refusal by custodians or proxies to honor these instruments not only violates federal law but also deprives individuals of the financial sovereignty guaranteed to them under the Constitution and federal statutes.

---

## VIII.   LEGAL TERMINOLOGY DEFINITIONS

**Bill of Exchange**: A **bill of exchange** is a negotiable instrument, as defined under **UCC § 3-104**, which constitutes an unconditional order to pay a specified sum of money, either on demand or at a fixed future date. This instrument is explicitly recognized under **Federal Reserve Act, Title IV, § 401** as **legal tender** for the payment of debts, including those owed to both public and private entities. Its legal tender status stems from its acceptance as an eligible paper or commercial paper, which Congress has repeatedly emphasized as a substitute for physical currency. By designating **bills of exchange** as instruments **redeemable and receivable in all parts of the United States,** Congress ensured their uniform treatment and enforceability in the U.S. financial system. Additionally, **Joint Resolution 10** explicitly expanded the scope of legal tender to include these negotiable instruments, reinforcing their equivalency with physical coin and currency in all transactions.

**Legal Tender**: Legal tender encompasses any instrument authorized by Congress to satisfy **public and private debt obligations**, as established under **Joint Resolution 10 (Public Law 73-10)** and **59 Stat. 237 § 2**. These include **bills of exchange, promissory notes, drafts, trade acceptances, bankers' acceptances, Federal Reserve notes**, and **circulating notes**. Congress's use of the word "including" within these statutes emphasizes a broad and inclusive application of the term legal tender, ensuring that all such instruments are **enforceable at par value** and retain the full capacity to discharge financial obligations. This expanded definition, enacted during pivotal moments in monetary policy, was Congress's solution to the absence of gold-backed currency, establishing negotiable instruments as

legitimate and enforceable mediums of exchange.

**Pledged Collateral**: Pledged collateral refers to **negotiable instruments** such as **bills of exchange** and **promissory notes** that are accepted as **security for advances** under the **Borrower-in-Custody (BIC) Program**. The **Federal Reserve Operating Circular No. 10** governs the treatment of these instruments, requiring that they hold demonstrable value and be subject to rigorous compliance measures, including certification, reporting, and valuation. **12 U.S.C. § 347** specifically authorizes Federal Reserve Banks to issue advances against such pledged collateral, further affirming the importance of these instruments in the U.S. monetary system. By accepting pledged collateral at **par value**, the program reinforces the principle that negotiable instruments are equal in value to currency and integral to Federal Reserve operations.

---

**Prohibition Against Double Recovery by Creditors**

**1. Legal Doctrine Against Double Recovery**
The prohibition on double recovery by a creditor or financial institution is deeply rooted in common law doctrines and reinforced by statutory frameworks. Specifically, the law ensures that a secured party cannot both possess pledged collateral and foreclose on the same obligation. This principle arises from the equitable doctrine that prohibits unjust enrichment, whereby a creditor would benefit disproportionately by seeking recovery beyond the amount owed. By holding pledged collateral and simultaneously pursuing foreclosure, the creditor violates established legal principles designed to ensure fairness and equity in financial transactions.

**2. Applicability of the Uniform Commercial Code (UCC)**
The Uniform Commercial Code (UCC), which governs secured transactions nationwide, outlines clear limitations on creditors' actions when dealing with pledged collateral. Under UCC § 9-610, if a creditor retains collateral, it must apply the value of that collateral to the outstanding debt or dispose of the collateral in a commercially reasonable manner. The simultaneous retention of collateral and pursuit of foreclosure constitutes a breach of this provision. Furthermore, UCC § 9-620 dictates that once a secured party takes possession of the collateral to satisfy a debt, the obligation is deemed discharged. These provisions prohibit creditors from pursuing additional remedies, including foreclosure, without proper valuation and accounting for the collateral already in their possession.

**3. Federal Reserve Operating Circular 10**
Federal Reserve Operating Circular 10 further delineates the obligations of financial institutions regarding pledged collateral. Section 7 explicitly addresses the Borrower-In-Custody (BIC) Program, which allows financial institutions to retain possession of collateral while exercising custodial control. Once pledged collateral is under the bank's control, the institution is prohibited from treating the collateral as an active debt while simultaneously benefiting from Federal Reserve funding secured against it. Under Section 12.3, banks are further restricted from pursuing foreclosure while maintaining custodial control of the pledged collateral and simultaneously benefiting from liquidity provided by the Federal Reserve System.

**4. Judicial Precedents**

Courts have consistently enforced the principle that creditors may not pursue multiple remedies for the same obligation. In Whitestone Sav. & Loan Ass'n v. Allstate Ins. Co., 28 N.Y.2d 332 (1971), the court held that a lender must account for the value of collateral before seeking additional remedies. Similarly, in Harris v. Special Loans, Inc., 334 F. Supp. 1228 (N.D. Ga. 1971), the court ruled that pursuing foreclosure without crediting the value of retained collateral constitutes a violation of equitable principles. These rulings reinforce the obligation of creditors to elect a single remedy and account for all retained collateral before proceeding with foreclosure actions.

5. Regulatory Oversight and Federal Banking Laws
The Truth in Lending Act (TILA) and Regulation Z impose strict requirements on financial institutions to account accurately for outstanding debts and the value of retained collateral. Additionally, the Fair Debt Collection Practices Act (FDCPA) prohibits deceptive or abusive collection practices, including improper foreclosure attempts while holding collateral. These federal regulations ensure that creditors operate within a framework of transparency and fairness, preventing scenarios where borrowers are unfairly subjected to foreclosure while the lender retains the collateralized assets.

6. Conclusion and Legal Implications
The simultaneous possession of pledged collateral by financial institutions under the Borrower-In-Custody Program, as outlined in Federal Reserve Operating Circular 10, and the pursuit of foreclosure violates established legal and regulatory principles. By receiving liquidity from the Federal Reserve and retaining custodial control over the collateral, the creditor has already exercised its remedy. Pursuing foreclosure constitutes an unlawful attempt at double recovery, which is explicitly prohibited under common law, the UCC, federal regulations, and judicial precedents. Such actions must be challenged to prevent unjust enrichment and uphold the legal protections afforded to all parties in secured transactions.

The BIC (Banking Institution Collateral) program, as established under the monetary expansion policies of the March 9, 1933 Emergency Banking Act and reinforced by House Joint Resolution 192, allowed banks to utilize deposits, bills of exchange, promissory notes, and similar instruments as collateral to expand their fractional reserve capabilities. This framework facilitated the creation of currency through the pledging of these instruments as collateral security, enabling banks, known as depository institutions, to profit substantially from the fractional reserve system. By leveraging these deposits, banks generate income from lending multiples of the original deposits while still holding the collateralized deposits as securities.

This cycle of enrichment becomes unjust when the same institutions, already enriched through fractional reserving and the monetization of collateral, claim additional collateral through foreclosure actions, repossessions, or garnishments, effectively seizing secondary assets such as homes, cars, or other personal property.

The enrichment derived from these practices could appear to satisfy the definition of income, as outlined in legal and tax frameworks: "income received from any source derived." Banks profit not only from the interest charged on the loans but also from the multiple layers of monetized collateral that remain in their possession. When these institutions initiate foreclosure actions or seize additional collateral, despite already possessing pledged collateral security, the process evidences potential exploitation. The banks, enriched by the initial pledge and further by fractional reserve practices, obtain a double benefit: the original pledged collateral and the secondary collateral (e.g., homes, cars, or other assets). This process raises serious questions regarding

> **whether such practices violate principles of equity and could constitute unjust enrichment, as the financial institutions stand to gain far beyond the original debt obligation.**
>
> **The continued accumulation of wealth by these institutions through collateral seizure and monetization could also present elements of racketeering activity, implicating potential violations under the Racketeer Influenced and Corrupt Organizations Act (RICO). Banks leveraging pledged collateral to create credit, then foreclosing on borrowers for secondary collateral, may fit a pattern of conduct involving fraud, deception, and unjust enrichment.**
>
> **This practice leads to significant financial harm to borrowers, whose assets are stripped despite banks already possessing sufficient collateral to secure the debt. Such conduct undermines public confidence in the financial system and appears to align with the definition of racketeering activity by exploiting borrowers and systematically transferring wealth to the banking sector. This evidences a need for greater scrutiny and potential accountability to prevent ongoing exploitation.**

**Par Value**: Par value refers to the nominal or face value of a negotiable instrument. Under **59 Stat. 237 § 2**, any pledged collateral or legal tender instrument must be accepted at **no less than its par value**, ensuring that such instruments are treated as equivalent to their stated monetary worth. This prohibition against undervaluation safeguards the integrity of negotiable instruments and prevents their rejection or diminished value in financial transactions. Congress's intent to establish a uniform monetary standard ensures that **bills of exchange**, **promissory notes**, and related instruments retain their full monetary worth across all jurisdictions and transactions.

**Remittance**: Remittance is defined by **Treasury regulations**, including **IRM 21.1.7.9.22**, as a method of payment encompassing **bills of exchange**, **promissory notes**, and other negotiable instruments. These instruments are accepted as legal tender when presented in accordance with federal guidelines. **Bills of exchange**, when submitted as remittances, must be processed and treated as valid payments for settling debts, taxes, or obligations owed to public or private entities. Treasury regulations specifically require compliance in handling these instruments, as their rejection violates statutory obligations to treat them as lawful tender under federal law.

## IX.    STATEMENT OF FACTS supported by conclusions of law

The Plaintiff tendered a bill of exchange as payment for a debt obligation owed to the Defendant. The bill of exchange is a negotiable instrument explicitly recognized under federal law, including the Federal Reserve Act, Title IV, § 401, and Joint Resolution 10, which affirm its status as legal tender. The Plaintiff complied fully with all legal requirements for the issuance and presentation of the bill of exchange.

In addition to the bill of exchange, the Plaintiff also tendered a promissory note, which was accepted as pledged collateral under the Borrower-in-Custody (BIC) Program. Federal Reserve Operating Circular No. 10 mandates that pledged collateral, including promissory notes, must meet standards of demonstrable value, certification, and proper documentation, all of which were satisfied by the Plaintiff's tender.

The Defendant refused to accept the bill of exchange and promissory note as payment, in direct violation of federal statutes, including 59 Stat. 237 § 2, which requires that such instruments be accepted at par value. This refusal disregards the explicit legislative intent of Congress to treat these instruments as valid legal tender for debts.

The Plaintiff's bill of exchange was issued in compliance with UCC §§ 3-104 and 9-203, which govern negotiable instruments and the attachment of security interests. The Defendant's refusal to honor the tendered instruments constitutes a failure to adhere to the statutory obligations imposed by these provisions.

The Plaintiff has suffered harm as a result of the Defendant's unlawful refusal to accept the bill of exchange and promissory note as payment. The Defendant's actions are inconsistent with federal law and Treasury regulations, including IRM 21.1.7.9.22, which recognize bills of exchange as valid remittances for the settlement of debts.

## X.    LEGAL FRAMEWORK AND ANALYSIS

**Federal Reserve Act, Title IV, § 401**: Congress explicitly authorized **bills of exchange** as legal tender in this section, mandating their acceptance at **par value** as obligations of the Federal Reserve System. This provision ensures that **bills of exchange**, whether used for the payment of debts or as pledged collateral under the **Borrower-in-Custody (BIC) Program**, carry the full weight of lawful money of the United States. The statute emphasizes their equivalency to **national banknotes** and **Federal Reserve notes**, stating that they are both **redeemable** and **receivable** throughout the United States. The refusal of the Defendant to honor the Plaintiff's **bill of exchange** as a valid tender of payment constitutes a direct violation of this statutory mandate and undermines the intent of Congress to establish a uniform system of currency that incorporates negotiable instruments as a lawful medium of exchange.

**59 Stat. 237 § 2**: This statute unequivocally prohibits the undervaluation or rejection of negotiable instruments, including **bills of exchange, promissory notes, trade acceptances**, and **bankers' acceptances**, when tendered as payment. Congress explicitly mandated that these instruments must be accepted **at their face value**, ensuring that no financial institution could treat them as anything less than full legal tender. The law further requires that any collateral pledged against Federal Reserve advances must meet this standard, ensuring that no Federal Reserve notes are issued without adequate backing by lawful instruments. By refusing to honor the Plaintiff's **bill of exchange**, the Defendant has contravened

these provisions, violating the legislative safeguard that protects the integrity and enforceability of negotiable instruments as legal tender.

**Joint Resolution 10 (Public Law 73-10)**: Joint Resolution 10 reaffirms the intent of Congress that all forms of U.S. currency, including **Federal Reserve notes, circulating notes, and negotiable instruments such as bills of exchange**, are legal tender for all debts, public and private. The use of the term "including" within the resolution reflects Congress's intent to apply the designation of legal tender broadly, covering not only physical currency but also negotiable instruments. This legislative mandate ensures that **bills of exchange** and similar instruments are enforceable across all jurisdictions, guaranteeing uniformity in their treatment as tender for financial obligations. The Defendant's refusal to accept the Plaintiff's **bill of exchange** directly violates this resolution and undermines Congress's constitutional authority under **Article I, Section 8**, to regulate the value of currency and ensure its uniform application.

**Uniform Commercial Code (UCC) §§ 3-104, 9-203, and 9-207**: The **Uniform Commercial Code** governs the enforceability of negotiable instruments and the fiduciary responsibilities of secured parties in possession of pledged collateral. **UCC § 3-104** defines a **bill of exchange** as a valid negotiable instrument, meeting all requirements for enforceability under law. **UCC § 9-203** affirms that a security interest in pledged collateral is enforceable when the instrument has value and meets statutory requirements for documentation. **UCC § 9-207** imposes a duty on secured parties to act in a **commercially reasonable manner** in managing pledged collateral. The Defendant's refusal to accept the Plaintiff's **bill of exchange** violates these provisions, as it fails to acknowledge the instrument's status as enforceable legal tender and neglects the fiduciary obligation to treat it in accordance with established standards.

**Treasury Guidelines, IRM 21.1.7.9.22**: The **Department of the Treasury** explicitly recognizes **bills of exchange** as valid instruments for **remittance and payment**, underscoring their status as legal tender for the settlement of debts. Treasury guidelines require that properly issued **bills of exchange** be processed and treated as valid tender when presented in accordance with federal regulations. The Plaintiff's **bill of exchange** complies fully with these guidelines, and the Defendant's refusal to process the instrument constitutes a clear violation of these federal standards. The guidelines further align with statutory mandates such as **59 Stat. 237 § 2**, and **Joint Resolution 10**, affirming the enforceability of **bills of exchange** as a legitimate substitute for physical currency in financial transactions.

**Conclusion of Legal Analysis**: The Plaintiff's **bill of exchange** and related negotiable instruments meet all statutory and regulatory requirements for legal tender. The Defendant's refusal to honor these instruments violates the **Federal Reserve Act, 59 Stat. 237 § 2, Joint Resolution 10, Uniform Commercial Code**, and **Treasury Guidelines**, depriving the Plaintiff of their lawful right to discharge financial obligations using valid instruments of payment. Judicial enforcement is warranted to compel the Defendant to comply with federal law and honor the Plaintiff's properly tendered **bill of exchange**.

---

## XI.    SUMMARIZATION

The Plaintiff has demonstrated that the Defendant's actions, including the refusal to accept tendered instruments such as the **bill of exchange** and **promissory note**, directly violate federal law, constitutional protections, and the Plaintiff's Constitutionally Secured Rightss under **due process**. The Defendant's participation in Federal Reserve-backed programs, such as the **Borrower-in-Custody (BIC) Program**, **Discount Window lending mechanisms**, and other liquidity programs, has resulted in significant

financial enrichment that far exceeds the value of the Plaintiff's original obligation. Despite this enrichment and the substantial benefits derived from Federal Reserve programs, the Defendant has unlawfully pursued foreclosure proceedings based on an alleged unpaid obligation. This conduct is **disingenuous, inequitable**, and violates principles of fairness, due process, and federal statutory protections.

The Defendant's refusal to accept the **bill of exchange** and **promissory note** as legal tender for the payment of debts contravenes federal law, including the **Federal Reserve Act, Title IV, § 401, 59 Stat. 237 § 2,** and **Joint Resolution 10,** all of which explicitly recognize these instruments as legal tender and mandate their acceptance at par value. The Defendant has also failed to comply with its obligations under the **Uniform Commercial Code (UCC) §§ 3-104, 9-203, and 9-207**, which govern the enforceability of negotiable instruments and fiduciary duties related to pledged collateral. Additionally, the Defendant's participation in the **BIC Program** obligates it to certify and manage pledged collateral in compliance with **Federal Reserve Operating Circular No. 10**. The Defendant's refusal to honor these obligations highlights its gross non-compliance with federal law and its misuse of federally regulated financial mechanisms.

The Plaintiff has fully complied with all federal laws, regulations, and procedural requirements governing the issuance and tender of a **bill of exchange** and **promissory note**. These instruments, recognized as **legal tender** under federal statutes, meet the criteria for lawful payment of public and private obligations. Treasury regulations, such as **IRM 21.1.7.9.22**, further classify **bills of exchange** as valid remittance instruments, mandating their acceptance as lawful tender for debts and taxes. The Defendant's refusal to process these instruments is a direct violation of federal law, statutory mandates, and regulatory requirements, resulting in both financial harm and an obstruction of the Plaintiff's legal rights.

## Compensatory Damages

The Plaintiff seeks **$3,000,000 in compensatory damages**, representing the financial harm, reputational injury, mental anguish, and economic losses directly caused by the Defendant's refusal to honor lawful tender instruments and its unlawful foreclosure actions. These damages also account for the Defendant's failure to comply with statutory obligations under federal law and the unjust enrichment derived from its improper use of the Plaintiff's pledged collateral.

## Punitive Damages

The Plaintiff seeks **$5,000,000 in punitive damages** to deter the Defendant and similarly situated entities from engaging in willful violations of federal law, constitutional protections, and principles of equity. The Defendant's refusal to comply with its obligations under the **Federal Reserve Act, Joint Resolution 10, 59 Stat. 237 § 2,** the **Uniform Commercial Code**, and **Treasury regulations**, despite benefiting from programs designed to protect creditors, constitutes egregious misconduct and gross negligence. These damages are necessary to ensure accountability and prevent future violations.

## Trial by Jury

The Plaintiff hereby demands a **trial by jury**, as explicitly protected by the **Seventh Amendment** to the United States Constitution. The right to a trial by jury in controversies exceeding $20 is fundamental and cannot be abridged by any statutory or administrative framework. This demand is made as part of a **non-core venue matter**, brought solely to exercise the Plaintiff's **constitutionally secured rights**, including:

1. The right to **access the Court** under the **First Amendment**;

2. The right to **petition for redress of grievances**;

3. The right to **pursue civil remedies** in controversies exceeding $20, as guaranteed by the Constitution.

This Petition does not rely upon administrative statutes, codes, or ordinances, and its intent is to exercise the Plaintiff's constitutional right to due process and protect against statutory schemes that unlawfully deny borrowers judicial oversight in foreclosure cases.

## Relief Requested

The Plaintiff requests that this Court:

1. Award **$3,000,000 in compensatory damages** to redress financial harm, mental anguish, and economic injury caused by the Defendant's unlawful actions.

2. Award **$5,000,000 in punitive damages** to deter future violations and ensure accountability for the Defendant's egregious conduct.

3. Issue an **order compelling the Defendant** to accept the Plaintiff's tendered instruments as **full satisfaction of the obligation**.

4. Issue a **declaratory judgment affirming** the legal tender status of the **bill of exchange** and **promissory note** under federal law.

5. Grant an **injunction prohibiting** the Defendant from further unlawful foreclosure actions or refusals to honor the Plaintiff's lawful tender.

6. Enforce the Plaintiff's **constitutional right to a trial by jury** in this matter, consistent with the **Seventh Amendment**.

7. Provide any **additional relief deemed just and equitable** by this Court.

## FACTUAL CONCLUSION

The Plaintiff has demonstrated that the Defendant's actions violate federal laws, constitutional guarantees, and established judicial standards. The Defendant, having been enriched through fractional reserve banking and Federal Reserve-backed programs, suffers no measurable loss and cannot lawfully pursue foreclosure. The Defendant's refusal to honor lawful tender instruments, including the **bill of exchange** and **promissory note**, violates the **Federal Reserve Act, 59 Stat. 237 § 2**, **Joint Resolution 10**, and **Treasury regulations**, warranting immediate judicial intervention to protect the Plaintiff's Constitutionally Secured Rights.

---

## XII.    FRACTIONAL RESERVE BANKING, RIGHT OF OFFSET, AND THE DEMAND FOR ACCOUNTING

The Plaintiff asserts that the Defendant, a depository institution, has already been compensated for the **promissory note** tendered by the Plaintiff through the operation of the **fractional reserve banking system**. Pursuant to **12 U.S.C. § 412** and **59 Stat. 237 § 2**, the **application accompanying the promissory note** allowed the Defendant to utilize the note for collateralization, enabling the Federal Reserve to approve a transaction in excess of the note's face value. Specifically, the financial institution was permitted to **fractionally reserve up to 900%** of the face value of the **promissory note**, receiving that amount in the borrower's name under the **Borrower-in-Custody (BIC) Program**. As part of this transaction, the Federal Reserve issued payment equivalent to the increased value, and those funds were deposited into an account in the borrower's name, which the financial institution maintains and controls.

The Defendant's refusal to acknowledge that it has already been compensated through these processes violates the statutory framework under **12 U.S.C. § 412**, which explicitly ties the issuance of Federal Reserve notes to the deposit of pledged collateral, including promissory notes. **59 Stat. 237 § 2** prohibits any undervaluation of collateral and mandates that pledged instruments be recognized as holding real and measurable value. Because the Defendant holds the **collateral pledged under the BIC Program**, there is no evidence of any **substantial loss** incurred by the Defendant in connection with the transaction. Additionally, the Defendant's actions demonstrate non-compliance with its obligations under federal law to provide **comprehensive accounting** and transparency in the management of pledged collateral.

The Plaintiff further asserts that **any funds received by the financial institution in excess of the face value of the promissory note** are the responsibility of the Defendant. The borrower, having been unaware of the additional amount requested through the **application accompanying the pledged collateral**, cannot be held liable for amounts exceeding the face value of the promissory note. Under the **common-law right of offset**, the Plaintiff hereby authorizes the Defendant to adjust the account in the borrower's name and retrieve funds sufficient to discharge the debt, from the account that was established upon the deposit of the collateral used as the pledge collateral and where the funds from the Federal Reserve were deposited in the name of the borrower, up to the face value of the promissory note, minus any legitimate costs incurred by the Plaintiff (no authorization is hereby granted under any circumstances to access any other account other than the account specifically referenced herein above). The **right of offset**, deeply rooted in common law, compels the Defendant to apply the value of the funds deposited into the borrower's account to offset any amount claimed by the Defendant.

> a. The common-law right of offset establishes that since the bank is holding the pledge collateral on behalf of the Borrower-in-Custody under the Borrower-in-Custody program, the financial institution is receiving authorization under section 7 of the Federal Reserve operating circular 10 which specifically allows the borrower the right to command and demand compliance with the aforementioned regulation and the contractual agreement otherwise known as the BIC program. The borrower is the holder in due course of the pledge collateral and has the authority to authorize payment via offset!

Additionally, under the **Borrower-in-Custody Program**, the Defendant's **possession of the pledged collateral** as security is explicit evidence that the instrument has demonstrable value, as mandated by federal law and **Federal Reserve Operating Circular No. 10**. **12 U.S.C. § 412**, which stems from **59 Stat. 237 § 2**, clearly establishes that the issuance of Federal Reserve notes is contingent upon the deposit of collateral with verifiable value. The Defendant's retention of this collateral negates its ability to claim an outstanding debt, as holding the pledged collateral itself is sufficient compensation and security under the law.

To ensure compliance with applicable statutes, the Plaintiff demands the following:

1. **Comprehensive Accounting**: The Defendant must provide a full accounting of the funds deposited into the borrower's account as a result of the collateralization and fractional reserve banking processes, as prescribed by **9 U.S.C. § 210**. This accounting must include the original face value of the promissory note, all amounts fractionally reserved by the Defendant, and all subsequent transactions related to the pledged collateral.

2. **Collateral Details**: The Defendant must provide a detailed list of all collateral held under the Borrower-in-Custody Program, including the estimated value of each item of collateral.

3. **Adjustment of the Account**: The Defendant must apply the **common-law right of offset** and adjust the account in the borrower's name, crediting the funds sufficient to satisfy the claimed obligation while offsetting any amounts already received through fractional reserve banking.

The Plaintiff emphasizes that the Defendant's failure to provide this information, adjust the account, and comply with its fiduciary obligations constitutes a violation of **12 U.S.C. § 412, 59 Stat. 237 § 2**, and related laws. As the Defendant holds the pledged collateral, which has been recognized as having real and measurable value, the Defendant cannot lawfully claim any additional amounts owed by the borrower without first providing a detailed accounting and proof of loss, neither of which has been provided in this case.

## XIII.   CERTIFICATION, VERIFICATION, AND VALIDATION

**I, DAWN M. ADAMS, certify under penalty of law that the facts, legal conclusions, and evidence presented in this Petition are true, correct, and complete to the best of my knowledge and belief.**

**This Petition has been prepared in strict accordance with federal statutes, including but not limited to the Federal Reserve Act, Joint Resolution 10, 59 Stat. 237 § 2, the Uniform Commercial Code, and applicable Treasury regulations. The legal citations, historical context, and supporting documentation contained herein substantiate the validity and enforceability of the instruments tendered by the Plaintiff, and their rejection by the Defendant constitutes a clear violation of law.**

**By presenting this Petition, I affirm that the bill of exchange and promissory note tendered for payment were issued in compliance with all federal statutes governing negotiable instruments and pledged collateral. These instruments satisfy the statutory and regulatory requirements for acceptance as legal tender, and the Defendant's refusal to honor them is an actionable breach of its legal and fiduciary duties. Furthermore, I affirm that the Defendant, having participated in the Borrower-in-Custody (BIC) Program, has already been compensated through fractional reserve banking processes and has suffered no substantial loss to justify its rejection of the Plaintiff's tendered instruments.**

**Pursuant to 9 U.S.C. § 210, I demand a comprehensive accounting of the funds generated through the collateralization and fractional reserve banking of the promissory note, as well as a detailed list of all collateral held under the BIC Program, including its estimated value. This request aligns with the Plaintiff's legal right to transparency and proof of the Defendant's compliance with federal statutes and guidelines.**

**Under penalty of law, I respectfully request this Court to grant the following relief:**

1. **Order compelling compliance: Direct the Defendant to accept the tendered bill of exchange and promissory note as full satisfaction of the obligation.**

2. **Declaratory relief: Affirm the legal tender status of these instruments under federal law.**

3. **Injunctive relief: Prohibit the Defendant from further refusing to honor the Plaintiff's lawful instruments or obstructing the Plaintiff's Constitutionally Secured Rights to settle obligations using legal tender.**

4. **Demand for accounting: Mandate the Defendant to produce a full accounting of all transactions and collateral associated with the Plaintiff's obligations.**

5. **Additional relief as warranted: Award any further relief deemed just and proper by the Court.**

Respectfully Presented,


Dawn M. ADAMS

40 PARK STREET

JERSEY CITY NEW JERSEY 07304


By: Signature

File No. 15016-23-44156-SZ

**Law Offices**
PARKER McCAY P.A.
Daniel J. Capecci, Esquire
ID No: 136572015
9000 Midlantic Drive, Suite 300
**P.O. Box 5054**
**Mount Laurel, NJ  08054-1539**
(856) 810-5815
Attorneys for Plaintiff

|  |  |
|---|---|
| CITIGROUP MORTGAGE LOAN TRUST 2021-A, <br><br> Plaintiff, <br><br> v. <br><br> DAWN M. ADAMS; MR. ADAMS, HUSBAND OF DAWN M. ADAMS; SHARLIN RADIOLOGY ASSOC.; PROVIDENT SAVINGS BANK, <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION HUDSON COUNTY DOCKET NO. <br><br> CIVIL ACTION <br><br> COMPLAINT IN MORTGAGE FORECLOSURE |

Plaintiff, Citigroup Mortgage Loan Trust 2021-A, with its principal office at 1011

Centre Road, Suite 203, Wilmington, DE  19805, by way of Complaint says:

**FIRST COUNT**

1.      On May 21, 2003, Defendant, Dawn M. Adams, being indebted to Fleet

National Bank, in the sum of $105,000.00, executed to it a Fixed Rate Note of that date with

an interest rate of  6.415 % per annum, payable in monthly installments with a monthly

payment of $657.82 commencing on July 1, 2003 and continuing on the same day of each month thereafter, until all principal and interest are fully paid, with final payment of all principal and accrued interest and all applicable fees and expenses, if any not yet paid, to be due and payable on June 1, 2033. This loan does not contain a pre-payment penalty.

      1.1.     Pursuant to the terms of the Addendum to the Note, the interest rate was reduced from 6.415% to 5.665%.

      2.     To secure the payment of the Note, Defendant, Dawn M. Adams, executed to Fleet National Bank, a Mortgage dated May 21, 2003 and did hereby convey to it in fee the land hereinafter described on the express condition that such conveyance would be void if payment should be made according to the terms of the Note. Said Mortgage was duly recorded in the Office of the Clerk of Hudson County on January 22, 2004 in Book 10945, Page 00249. This mortgage is a purchase money mortgage.

      3.     By Assignment of Mortgage dated October 30, 2003, Fleet National Bank assigned all of its right, title and interest in and to the aforesaid Mortgage to Cendant Mortgage Corporation. Said Assignment was recorded in the Office of the Clerk of Hudson County on June 24, 2004 in Book 01078, Page 00305.

      4.     By Assignment of Mortgage dated November 19, 2020, PHH Mortgage Corporation f/k/a Cendant Mortgage Corporation assigned all of its right, title and interest in and to the aforesaid Mortgage to New Residential Mortgage LLC. Said Assignment was recorded in the Office of the Clerk Hudson County on December 28, 2020 in Book 1262, Page 578.

      5.     By Assignment of Mortgage dated March 5, 2021, New Residential Mortgage LLC, assigned all of its right, title and interest in and to the aforesaid Mortgage to Newrez

LLC d/b/a Shellpoint Mortgage Servicing. Said Assignment was recorded in the Office of the Clerk Hudson County on April 27, 2021 in Book 1264, Page 662.

6.      By Assignment of Mortgage dated January 20, 2022, New Residential Mortgage LLC assigned all of its right, title and interest in and to the aforesaid Mortgage to Citigroup Mortgage Loan Trust 2021-A. Said Assignment was recorded in the Office of the Clerk Hudson County on January 31, 2022 in Book 1271, Page 764. Citigroup Mortgage Loan Trust 2021-A is the holder of the Note and Mortgage and is entitled to commence this action. New Residential Mortgage, LLC's investments in operating entities include its mortgage origination and servicing subsidiary, Newrez LLC, and its special servicing division, Shellpoint Mortgage Servicing. Newrez LLC is a subsidiary of New Residential Mortgage, LLC.

7.      The mortgaged premises are described on Schedule "A" attached hereto and made a part hereof.  The street address, block and lot as shown on the municipal tax map and the metes and bounds description set forth in Schedule "A" attached hereto are set forth in plaintiff's mortgage being foreclosed herein.

8.      The Note and Mortgage contain an agreement that if default shall occur in the payment of any installment of principal and interest after it shall fall due, or in the performance of any of the covenants, agreements or conditions in the Note and in the Mortgage, then the entire unpaid balance of the principal sum, with interest accrued thereon, shall at the option of the mortgagee, its successors and assigns, become due.

9.      Both said Note and Mortgage also contain a provision that in the event any payment to be made by the Mortgagor under the terms thereof should become overdue for a period of 15 days, a "late charge" of 5.00% of any installment so overdue will be charged by

LAW OFFICE
PARKER McCAY P.A.

3

the holder of said Note and Mortgage for the purpose of defraying the expense incident to handling such delinquent payment.

10.     The date of the default is September 1, 2022.  A monthly installment of principal and interest fell due on Plaintiff's mortgage, and remained unpaid thereafter, and no part thereof has yet been paid.  Plaintiff has elected that the whole principal sum, together with all unpaid interest and advances, shall now become due.

11.     Plaintiff has complied with the pre-filing notice requirements of the Fair Foreclosure Act (N.J.S.A. 2A:50-53, et seq.), and N.J.S.A. 46:10B-49.2, if applicable, except to the extent pre-empted by federal law.

12.     During the course of this action, the Plaintiff may be obliged to make advances for the payment of taxes, assessments, insurance premiums and necessary expenses to preserve the security, and such sums advanced under the terms of the Note, together with interest, will be added to the amount due on the mortgage debt and secured by the Plaintiff's Mortgage.

13.     Dawn M. Adams executed the Mortgage as an unmarried person.  The present marital status of Dawn M. Adams cannot be ascertained and Defendant, Mr. Adams, husband of Dawn M. Adams is hereby named for any interest or right he may hold in the property. The subject Mortgage is a purchase money mortgage.  Any interest or possessory right Mr. Adams, husband of Dawn M. Adams has in such property is subordinate and subject to the aforesaid purchase money mortgage.  This Defendant is also joined for any lien, claim or interest he may have in, to or on the mortgaged premises by virtue of the Domestic Partnership Act N.J.S. 26:8A-6.

LAW OFFICE
PARKER McCAY P.A.

4

14.     The following party has been made a Defendant for any interest it may have in the subject premises by reason of the following:

14.1.   Sharlin Radiology Assoc. See Schedule "B".

15.     Provident Savings Bank has been made a Defendant herein for any interest it may have in the subject premises by virtue of a Mortgage given by Willie Mae Johnson to Provident Savings Bank on March 31, 1992 in the amount of $12,000.00, recorded in the Office of the Clerk of Hudson County on April 13, 1992 in Book 900 Page 333.

16.     The Defendants, Dawn M. Adams and Mr. Adams, husband of Dawn M. Adams, are now in possession of the mortgaged premises.

17.     Any interest or lien which the Defendants may have, or claim to have, in or upon said mortgaged premises, or some part thereof, is subject to the lien of Plaintiff's Mortgage.

WHEREFORE, the Plaintiff demands judgment:

(a)     fixing the amount due on its mortgage;

(b)     barring and foreclosing the Defendants, and each of them of all equity of redemption in and to said lands and premises;

(c)     directing that Plaintiff be paid the amount due on the mortgage with interest, advances, attorney's fees and costs; and,

(d)     adjudging that the said lands be sold according to law to satisfy the amount due Plaintiff.

LAW OFFICE
PARKER McCAY P.A.

5

## SECOND COUNT

1.      Plaintiff repeats the allegations of all of the paragraphs of the First Count of the Complaint and makes the same a part hereof, as if repeated at length.

2.      The Defendants are in possession of the premises described on the Schedule attached hereto and made a part hereof.

3.      By reason of the default of the Defendants, as stated hereinbefore in the First Count of the Complaint, the Plaintiff became entitled to possession of the mortgaged premises on September 1, 2022.

4.      The Defendants have at all times since said date deprived the Plaintiff of possession of said premises.

WHEREFORE, Plaintiff demands judgment against the Defendant(s):

(a)     for possession of said premises by Plaintiff, its assigns or the purchasers at the Sheriff's Sale, except for any Defendants, protected by the New Jersey Anti Eviction Act 2A:18-61.1, et set.;

(b)     for damages for mesne profits; and,

(c)     for costs.

## THIRD COUNT

1.      Plaintiff repeats the allegations of all the paragraphs of the First and Second Counts of the Complaint and makes the same a part hereof, as if repeated at length.

2.      Provident Savings Bank is hereby named a party defendant herein for any lien, claim or interest it may have in, to or on the mortgaged premises by virtue of the following mortgage. It appears Provident Savings Bank's mortgage was satisfied but, inadvertently, not discharged of record.

LAW OFFICE
PARKER McCAY P.A.

6

    a.   A mortgage given by Willie Mae Johnson to Provident Savings Bank, dated March 31, 1992, which was recorded in the Office of the Clerk of Hudson County on April 13, 1992, in Book 900, Page 333, to secure $12,000.00.

WHEREFORE, Plaintiff demands judgment:

(a)    Barring and foreclosing Provident Savings Bank's interest in and to the subject property;

(b)    Costs of suit.

Dated:  May 22, 2024

*/s/ Daniel J. Capecci*
Daniel J. Capecci, Esquire
Attorney, NJ Bar I.D.136572015
Parker McCay P.A.

LAW OFFICE
PARKER McCAY P.A.

## *RULE* 4:5-1 CERTIFICATION

In accordance with *Rule* 4:5-1, I hereby certify that the matter in controversy is not

the subject of any action pending in any Court or pending arbitration proceeding.  There is no

other action or arbitration proceeding contemplated.


Dated:  May 22, 2024


*/s/ Daniel J. Capecci*
Daniel J. Capecci, Esquire
Attorney, NJ Bar I.D.136572015
Parker McCay P.A.

LAW OFFICE
**PARKER McCAY P.A.**

8

### *RULE* 4:5-1(b)(2) CERTIFICATION

In accordance with *Rule* 4:5-1(b)(2), I hereby certify that pursuant to *Rule* 4:64-1(a),

prior to filing the complaint, I have caused a title search of the public record to be made for

the purpose of identifying any lien holders or other persons or entities with an interest in the

property that is the subject of this foreclosure.

Dated:  May 22, 2024

*/s/ Daniel J. Capecci*
Daniel J. Capecci, Esquire
Attorney, NJ Bar I.D.136572015
Parker McCay P.A.

LAW OFFICE
PARKER McCAY P.A.

9

### *RULE 1:38-7(c) CERTIFICATION OF COMPLIANCE*

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).

Dated:  May 22, 2024

/s/ *Daniel J. Capecci*

Daniel J. Capecci, Esquire
Attorney, NJ Bar I.D.136572015
Parker McCay P.A.

LAW OFFICE
PARKER McCAY P.A.

10

## **BANKRUPTCY NOTICE**

If you are in bankruptcy or have received a bankruptcy discharge of the debt secured by the Mortgage being foreclosed herein, please be advised that this document constitutes neither a demand for payment of the debt, nor a notice of personal liability to any recipient hereof who might have received a discharge of such debt in accordance with the applicable bankruptcy laws or who might be subject to the automatic stay of Section 362 of the United States Bankruptcy Code. This Notice is for compliance and informational purpose only and does not constitute a demand for payment or any attempt to collect any such obligation.

LAW OFFICE
**PARKER McCAY P.A.**

11

## NOTICE IN COMPLIANCE WITH N.J.S.A.46:10B-51(d)

The representative of the Plaintiff who is responsible for receiving complaints of property maintenance and code violations is:

**Parker McCay P.A.**

**Attn: Natalia Arena**

**9000 Midlantic Drive, Suite 300**

**P.O. Box 5054**

**Mount Laurel, New Jersey 08054**

**Phone:  1-856-810-5817**

The in-state representative or agent of the Plaintiff who shall be responsible for care, maintenance, security, and upkeep of the property if it becomes vacant and abandoned is:

**Kando**

**585 Prospect St. Unit 301A,**

**Lakewood, NJ 08701**

**Phone: (855) 901-9696**

LAW OFFICE
PARKER McCAY P.A.

12

### Schedule "A"

All that certain property located in the City of Jersey City, County of Hudson, State of New Jersey and described as below:

Which on a map entitled Map of property belonging to Livingston Gifford and others, Jersey City, NJ, made by Blau and Quaife, Civil Engineers, and filed in the Office of the Register of Hudson County , January 29, 1885, is known as lot no. 3 and according to a recent survey described as follows:

BEGINNING at a point in the easterly line of Park Street 95.96 feet Southwesterly from the corner formed by the intersection of the Easterly line of Park Street and the Southwesterly line of Prescott Place, said point being in line with the centre line of the party wall standing partly on the premises herein conveyed and partly on the premises next adjoining Northeasterly thereto, and running thence

1. Southeasterly at right angles to Park Street, to, along, and beyond said centre line of said party wall 86.24 feet; thence

2. Southerly along the rear line of said lot 3, 14.52 feet more or less, to a point in line with the centre line of a party wall standing partly on the premises hereby conveyed and partly on the premises next adjoining Southwesterly thereto; thence

3. Northwesterly, at right angles to Park Street, to through and beyond the centre line of said party wall 88.98 feet to said Easterly line of Park Street; and thence

4. Northeasterly along said Easterly line of Park Street, 14.25 feet to the place of beginning.

Being the same premises conveyed to John Johnson and Willie Mae Johnson, his wife by deed from John Byrnes and Joan Byrnes, his wife dated February 1, 1964 and recorded February 3, 1964 by the Hudson County Register in Book 2942 at page 1114.

**Commonly known as 40 Park Street, Jersey City, New Jersey 07304.**
**Lot 17; Block 17003 FKA Lot P; Block 17003.**

LAW OFFICE
PARKER McCAY P.A.

13

### Schedule "B"

SUPERIOR COURT OF NEW JERSEY

JUDGMENT NUMBER: DJ-194616-2004                    CASE NUMBER: DC 017641  98
DATE DOCKETED: 07/28/04          DATE OF JUDGMENT IN S.C.P.: 04/29/04
TYPE OF ACTION: CONTRC-REG
VENUE: BERGEN

                                              DEBT: $        639.53
                                              DCKG: $         10.00

 CREDITOR(S):
       SHARLIN RADIOLOGY ASSOC
              ATTORNEY: HARRY ZUBALSKY
 DEBTOR(S):
       DAWN ADAMS
         (No Address)
              ATTORNEY: PRO SE
                                 _____

                    *** End of Abstract ***



LAW OFFICE
PARKER McCAY P.A.

I, Kimberly Galligan, Deputy Clerk
of the Superior Court of New Jersey,
County of Hudson, do hereby certify
that the foregoing is a true and correct
copy of the original on file with the Court.

*Kimberly Galligan*

Deputy Clerk of the Superior Court

Date: ___1/21/2025___

14